**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230690-U

Order filed December 11, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0690 Circuit No. 19-CF-2110 |
| | ) | |
| JULIUS RAMSEY, | ) ) | Honorable Jeffrey Scott MacKay, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE PETERSON delivered the judgment of the court.
Justices Holdridge and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   Defendant did not receive ineffective assistance of counsel.

¶ 2     Defendant, Julius Ramsey, appeals his convictions for aggravated kidnapping, aggravated criminal sexual abuse, and three counts of aggravated criminal sexual assault. Defendant argues counsel provided ineffective assistance when counsel made a promise to the jury that defendant would testify to explain his version of events and did not offer an explanation after defendant decided not to testify. We affirm.

¶ 3    I. BACKGROUND

¶ 4    In September 2019, defendant was indicted with aggravated kidnapping (720 ILCS 5/10-2(a)(6) (West 2018)), attempted aggravated criminal sexual assault (*id.* §§ 8-4(a), 11-1.30(a)(8)), aggravated criminal sexual abuse (*id.* § 11-1.60(a)(1)), and three counts of aggravated criminal sexual assault (*id.* § 11-1.30(a)(8)).

¶ 5    Defendant asserted the affirmative defense of consent, and the matter proceeded to a jury trial. During opening statements, defense counsel told the jury they would hear directly from defendant, who would concede there was a noncriminal sexual encounter with S.G. and explain how his DNA was found on a gun and why he made certain statements to the police.

¶ 6    The evidence at trial demonstrated the following. On September 9, 2019, S.G. was employed as a housekeeper at Hyatt House hotel. The day before, a supervisor informed S.G. to be aware of a man related to room 434 who was bothering housekeepers. While S.G. cleaned room 423, she saw a man in checkered shorts and a white shirt walk past the room twice. She was on the phone with her boyfriend when she heard a man tell her to hang up the phone and not turn around. S.G. saw a silver gun with a black handle. S.G. did as he ordered and heard the door to the room close. The man told her to get on her knees, and he placed a fabric over her head. S.G. could still see through the fabric but not clearly. The man forced S.G. to perform oral sex. The man held the gun to S.G.'s head, and she begged him not to kill her. S.G.'s boyfriend called her cell phone, and the man told her to answer and say she was okay. S.G. was crying when she spoke on the phone but told her boyfriend she was okay. S.G.'s boyfriend called the police and hotel employees to have someone check on S.G.

¶ 7    Meanwhile, the man grabbed, licked, and sucked S.G.'s breasts. She could feel the gun on her stomach and continued to beg him not to kill her. She then felt his mouth and tongue on her

2

vagina. The man rubbed his penis against S.G.'s anus. She felt the gun against her leg. The man inserted his penis into her vagina for approximately 7 to 10 minutes. Afterwards, he told S.G. to count to 20 while she laid on the bed.

¶ 8       When S.G. had counted to 13 or 14, she heard a knock on the door then a keycard was inserted and unlocked the door. She saw her assistant manager walk in and then back out. The assailant told her to get rid of whoever was at the door. S.G. got dressed while the man pointed the gun at her. S.G. went to the door and tried to get the assistant manager to leave while remaining partially behind the door. Other managers arrived and pressed S.G. about who was in the room with her, and she told them she did not want to lose her job. She then stepped fully out of the room, made a gun sign with her hand, and mouthed "he's got a gun." She ran to the elevator and told another employee that she was sexually assaulted by a man in room 423 who put a gun to her head. S.G. went to the hospital and her physical examination showed no vaginal trauma, which the nurse found unsurprising as vaginal tissue was capable of stretching, especially with the aid of saliva acting as a lubricant.

¶ 9       Shortly thereafter, the keycard for room 434 was inserted into the lock for room 209. The police arrived and learned defendant rented rooms 209 and 434. Defendant was staying at the hotel with his girlfriend, mother, and brother. The police handcuffed defendant, and without being questioned, defendant said, "it was my brother." S.G. did not identify defendant, who was wearing a white shirt and checkered shorts at that time, as the attacker because the attacker was wearing dark jeans and a black shirt. However, defendant had a bag with him that contained a black shirt. Afterwards, S.G. identified defendant in a police lineup.

¶ 10      At the police station, the police tried to obtain information from defendant regarding his brother's location. Defendant provided that his brother was aggressive, had a violent past, and had

3

previously had a gun. Defendant was released. The police located defendant's brother, who remained in custody for four days. During that time, the police reviewed surveillance videos, phone logs, and interviewed the hotel's assistant manager and defendant's mother. The police concluded only defendant occupied rooms 209 and 434 during the attack. The hotel's employees contacted the police after discovering a handbag under the bedframe in room 209. The bag contained a gun that matched the description provided by S.G. The police interviewed defendant again, and he denied having any sexual relations with a housekeeper. When officers informed defendant they had a search warrant for his DNA, defendant said the encounter was consensual, he was scared and did not want S.G. to get in trouble at work, and the gun was already in room 209. Defendant was placed under arrest. Forensic testing showed a high probability that defendant's DNA was on the vaginal swab taken from S.G. and the DNA swabs taken from the gun. Further, defendant's fingerprint was found on the gun. S.G. was unable to return to work and received a workers' compensation award.

¶ 11    Outside the presence of the jury, the State provided it was prepared to rest. Defendant moved for a directed verdict, which the circuit court denied. Defense counsel informed the court defendant would be testifying and he was made aware of his rights. Defendant stated he understood it was his decision if he wanted to testify but then asked for a break to speak with counsel. When defendant reappeared before the court, he stated he did not want to testify. During closing arguments, defense counsel questioned S.G.'s motives in reference to her workers' compensation claim, S.G.'s failure to identify defendant the first time, the lack of vaginal trauma, and the discovery of the gun under the bedframe by hotel employees when officers failed to find it during their search. Defense counsel argued: "[W]e're here today because [S.G.] was afraid of losing her job. And the prosecution, they have the burden of proof. They can call all the witnesses in the

4

world they want. [Defendant] doesn't have to do anything. [Defendant] can sit here like he did today and remain silent."

¶ 12    The jury found defendant guilty of all charges except attempted aggravated criminal sexual assault. Thereafter, defendant obtained new counsel and filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial. Among other things, defendant argued he received ineffective assistance of trial counsel when counsel failed to cross-examine S.G. and object to hearsay testimony.

¶ 13    The court held a hearing on the motion. Trial counsel testified he had 33 years of legal experience and had conducted many criminal trials. In defendant's case, he had at least seven conversations with defendant regarding trial strategy before trial, which included how counsel planned to challenge S.G.'s testimony. Counsel explained his strategy with respect to questioning S.G. depended on her testimony and the effect it had on the jury. During the trial, S.G. cried and the court took a break. Trial counsel recalled the jury scowling at him and defendant and told defendant the jury hated them. Counsel decided not to cross-examine S.G. because he felt that the jury could use it against defendant and it risked S.G. becoming even more emotional, which would garner S.G. more sympathy. Trial counsel stated defendant was aware it was possible that S.G. would not be cross-examined, and he did not object to certain evidence because it made it look like defendant had something to hide while the plan was for defendant to testify as to what really happened anyway. Every decision trial counsel made was based on the theory of consent and defendant testifying. Counsel was shocked when defendant told him that he was not going to testify, and defendant apologized. Trial counsel stated that defendant had a version of events that would make a good argument, and he thought defendant would be found not guilty. Defendant was

always adamant about testifying and was the only witness who could testify about his version of events.

¶ 14   Defendant testified he was never informed by trial counsel there was a possibility S.G. would not be cross-examined and this decision effected his choice not to testify. Defendant felt there was no defense at all. Defendant stated there were no conversations between him and trial counsel as to whether he was going to testify. However, defendant assumed he was going to testify, and when he changed his mind after the break, it was the first time he told trial counsel he was not going to testify. Defendant explained it was his decision not to testify but he was scared to testify because trial counsel said it could make things worse.

¶ 15   The court denied defendant's motion, finding trial counsel did not provide ineffective assistance. The matter proceeded to sentencing where the court sentenced defendant to an aggregate term of 88 years' imprisonment. Defendant appeals.

¶ 16                                                    II. ANALYSIS

¶ 17   On appeal, defendant argues his trial counsel provided ineffective assistance when counsel made a promise to the jury during his opening statement that defendant would testify to explain his version of events and did not offer an explanation to the jury after defendant decided not to testify. The State argues defendant forfeited this issue by failing to include it in his posttrial motion. However, a defendant may raise a claim of ineffective assistance of counsel for the first time on direct appeal where, as here, the basis of the appeal can be ascertained from the record. *People v. Veach*, 2017 IL 120649, ¶ 46.

¶ 18   The United States and Illinois Constitutions guarantee criminal defendants the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. In determining whether defendant was denied the effective assistance of counsel, we apply the two-

6

pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prevail on this claim, a criminal defendant must demonstrate that "(1) counsel's performance was deficient and (2) the deficient performance prejudiced defendant such that he was deprived of a fair trial." *People v. Brown*, 2023 IL 126852, ¶ 11. In proving deficient performance, a defendant must overcome the strong presumption that the challenged action or inaction by counsel may have been the product of sound trial strategy as such matters are generally immune from claims of ineffective assistance of counsel. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). Failure to establish either prong of this test will be fatal to the claim. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). Our review is *de novo*. *People v. Hale*, 2013 IL 113140, ¶ 15.

¶ 19        Defense counsel's promise to the jury in opening statements that a witness will testify and his failure to present that witness may constitute ineffective assistance. *People v. Briones*, 352 Ill. App. 3d 913, 918 (2004). However, defendant here does not argue counsel's failure to present his testimony amounted to ineffective assistance, as he points out the failure "may not have been the fault of trial counsel," but instead contends counsel's failure to present an explanation to the jury on the matter amounted to ineffective assistance.

¶ 20        We conclude trial counsel's performance was not deficient. The record clearly demonstrates counsel put forth a rigorous defense and appropriately addressed the absence of defendant's testimony during his closing argument. Defendant suggests counsel should have addressed his lack of testimony directly and explained he did not testify because the State failed to meet its burden. However, trial counsel's closing argument had the same effect. Counsel highlighted defendant's constitutional right not to testify and emphasized the burden was on the State to prove the charged offenses. *Supra* ¶ 11. This strategy balanced counsel's ethical duty of zealous advocacy with the objective of appearing trustworthy to the jury. See *People v. Edwards*,

195 Ill. 2d 142, 173-74 (2001) (explaining reviewing courts generally will not second-guess a matter involving trial strategy). We fail to identify what more counsel could have said to remedy defendant's own last minute decision not to testify. Regardless, even if trial counsel's closing argument was not provided in the exact manner defendant desired, defendant is only entitled to competent—not perfect—representation (*People v. Tucker*, 2017 IL App (5th) 130576, ¶ 26) and "[t]he fact that counsel's strategy did not prove successful, or that counsel might have chosen a different strategy in hindsight, does not render a strategy constitutionally ineffective." *People v. Massey*, 2019 IL App (1st) 162407, ¶ 31.

¶ 21    As a final matter, we reject the cases defendant relies on as they address claims of ineffective assistance of counsel for failure to call a witness as promised, which as defendant has clarified many times, is not the claim he raises. As we have found defendant cannot establish the first prong of *Strickland*, his claim fails. See *Richardson*, 189 Ill. 2d at 411.

¶ 22                                III. CONCLUSION

¶ 23    The judgment of the circuit court of Du Page County is affirmed.

¶ 24    Affirmed.